SJOBERG, Respondent, v. CHICAGO, M., & ST. P. RY. COMPANY, Appellant.

(155 N. W. 774.)

(File No. 3837. Opinion filed December 31, 1915. Rehearing denied February 9, 1916.)

Carriers—Negligence—Injury to Passenger—Dangerous Coupling— Sufficiency of Evidence—Directed Verdict.

In a suit by a passenger against a railroad company, for injuries alleged to have resulted from plaintiff's having fallen, or having been thrown by a sudden jerk of the train, into an alleged unprotected and dangerous coupling between the passenger and baggage cars, the defense being on the theory that plaintiff attempted to alight from the side of the car opposite the depot, before the train stopped, and fell or was thrown under the side of the car, and that the car wheel ran over his foot, injuring it, held, in view of the absence of definite evi-

dence as to how the accident occurred, and of plaintiff's failure to definitely deny having admitted to various witnesses that he had accounted for the injury by stating that two men threw him off from the car, that the evidence was insufficient to sustain the verdict for plaintiff.

Smith, J., not sitting.

Appeal from Circuit Court, Roberts County.  Hon. THOMAS L. BOUCK, Judge.

Action by M. O. Sjoberg, against the Chicago, Milwaukee & St. Paul Railway Company, to recover damages for personal injuries.  From a judgment for plaintiff, and from an order denying a new trial, defendant appeals.  Judgment and order reversed.

*William G. Porter,* and *E. L. Grantham,* for Appellant.

*C. R. Jorgenson,* and *Carston Eggen,* for Respondent.

POLLEY, J.   Plaintiff brought this action to recover damages for personal injuries alleged to have been caused by the negligence of defendant.  He recovered judgment, and defendant appeals.

As grounds for a reversal of the judgment and order overruling appellant's motion for a new trial, appellant assigns numerous alleged errors of the trial court in the admission and rejection of testimony, in the giving of certain instructions, and in refusing to give certain requested instructions to the jury.  He also assigns the insufficiency of the evidence to support the verdict.  If the evidence is insufficient to support the verdict, it will be unnecessary to consider the other assignments.

It appears from the testimony of plaintiff that he was a resident of Peever; that, on the evening of the accident causing the injury complained of, plaintiff was a passenger on defendant's train from Sisseton to Peever—a distance of about ten miles.  The train, so far as this case is concerned, consisted of two cars—a passenger coach and a baggage car.  The passenger coach was a vestibuled car, divided into two compartments, and was in the rear of the baggage car.  These cars were coupled together, and it is the manner of this coupling that is alleged to constitute the negligence that caused plaintiff's injury.  Said negligence is alleged in plaintiff's complaint as follows:

"That the couplings between the said two coaches or cars are left uncovered and unprotected between the platforms of the said

cars, or coaches, upon which platform passengers must necessarily walk in entering and leaving said coaches or cars; that between the platforms of said cars or coaches is a space and adjacent to the couplings thereof which is from 4 inches to 12 inches wide, as this plaintiff verily believes; that over this space or gap between the said platforms no cover was kept, and the same was so left that any one passing from one car to the other might easily get the foot into said space and between the said couplings; that this defective condition of said coaches or cars was well known to the defendant; that on the said 6th day of April, 1914, the defendants carelessly and wrongfully had the said defective coaches or cars in use for the purpose of carrying passengers."

The train left Sisseton about 8 o'clock in the evening. The night was quite dark. Plaintiff rode in the forward compartment of the passenger coach, and he, with two other men, were the only passengers in said compartment. The railroad track at Peever runs nearly due north and south, with the depot and platform on the west side. When the whistle blew for Peever, one of said men arose from his seat and passed out through the rear door of the compartment, and nothing further was seen of him. Plaintiff and the other passenger (Evans by name, and who was a witness at the trial) arose from their seats and started for the front door. Evans was ahead. He passed out into the vestibule and over onto the platform of the baggage car. He then stepped down onto the lower step of that car, where he stood until the train stopped, when he stepped off onto the platform in front of the depot and left without seeing or hearing anything more of plaintiff. Plaintiff testified that he followed Evans to the front door of the car; that, just as he stepped through the door, the car gave a heavy jerk and bump, and he fell down and felt an awful pain in his foot; that the next thing he knew he lay on the ground by the track; and that some boys picked him up and took him home. After the train had pulled out of the station, four boys (or young men) found plaintiff lying on the ground, on the east side of the railroad track, about 100 feet north of the depot, with all of the toes on his right foot so badly crushed that they had to be amputated. His right shoulder and the side of his head were also bruised and hurt. He further testified that there was an opening about 14 inches wide between the passenger coach and the

baggage car.   He said he thought his foot got caught between the cars, and that the reason why he though that was because there was an opening between the cars, and that he believed that he stepped into the opening, but admitted that he did not know how he got caught.  He said he did not know what happened from the time he got to the car door; and, in reply to the question, "You do not really know how you did get your toes pinched, do you?" he answered, "No, sir."   The witness Evans testified that, when the whistle blew for Peever, he and plaintiff arose and started for the front door; that plaintiff was just behind him; that he passed through the door and over onto the platform of the baggage car; that the reason why he crossed over to the baggage car was that the train stopped so quickly that the motion tion of his body carried him across.  He said he saw plaintiff come through the door, but did not see him afterward.  He said that it was a dark night, but that there were lamps burning inside the car, and that there was a window in the car door.  The door leading from the east side of the vestibule was closed, but the one on the west side (on the same side as the depot at Peever) was open, so that, unless plaintiff was thrown across by a violent motion of the car there appears to have been no occasion for plaintiff to have crossed over onto the platform of the baggage car.

But it is the theory of defendant that plaintiff attempted to alight from the car from the east side, before the train stopped, and, in so doing, fell, or was thrown, under the side of the car, and the wheel ran over his foot and injured it.  Of course, there is no proof that the injury was caused in this way; neither is there any proof, beyond plaintiff's conjecture, that he got his foot caught between the cars.  Defendant bases its theory upon the fact that plaintiff lived on the east side of the track, and the witness Evans' testimony to the effect that plaintiff told him, about the time the whistle blew for Peever, that he intended to get off on the east side; that he had been away a couple of days and was in a hurry to get home.  Plaintiff, on cross-examination, denied that he had intended to get off on the east side of the car; but, when asked if he did not tell Evans that he intended to get off on the east side, he answered, "I do not remember," but would not swear that he did not so state.  He was also asked if he did

not state to various persons, on the night of the accident and within a day or two thereafter, that he did not know how it happened, to which he answered, "I do not remember," but would not swear that he did not so state. He was asked if he did not, at the same time, say that two men pushed him off the car; and again he answered, "I do not remember," but would not swear that he did not make such statement. To the question, "Was there some talk about the men pushing you off the train, do you remember that?" he answered, "I do not remember." In fact, to most questions that were put to him touching the details of the accident, he gave the stereotyped answer, "I do not remember." In no case, though, would he swear that he did not make the statements referred to. One of the boys (Butterfield by name, who helped carry plaintiff home) testified that plaintiff said on the way home, and agains after he reached home, that two men pulled him off the train; that he thought he knew them, and thought they were Wilmot boys. Another witness (Steffler) testified that, on the day following the accident, plaintiff told him that two men got to quarrelling with him (plaintiff)—one on each side of him—and pushed him off the train; but, on being further questioned by the witness, plaintiff answer: "Joe, damn it! To tell you the truth, I do not know how it happened." The surgeon who dressed plaintiff's wounds, and who was called as a witness by plaintiff, in narrating a conversation he had with plaintiff a day or two after the accident, testified as follows:

"I asked him how it happened, and he said he got up to get out, and there were two men that were behind him, and he thought they pushed him out through the door, and, in some way, he fell off."

He further testified that plaintiff said he did not know how it happened.

It hardly seems possible that the accident could have occurred in the manner plaintiff says he thinks it did and the witness Evans know nothing about it. According to plaintiff's testimony, he and Evans could not have been an arm's length apart when they passed through the car door; but Evans was ahead and, if plaintiff had been thrown down or thrown forward by any sudden jerk or bump (as he described it) of the car, he must inevitably have fallen against Evans. No person who was on the train, except

plaintiff, pretended to have been aware that any jerk or any bump occurred. Evans testified that the car stopped so abruptly that the motion of his body carried him across to the platform of the baggage car, but this could not have thrown plaintiff down without his having fallen against Evans.

As a reason for his presence on the platform while the train was still in motion, plaintiff claims that the stop at Peever was so short that a person who remained in his seat until the train stopped would not have had time to get off. In this contention he is not supported by the evidence. True, the witness Evans testified that he came from Sisseton to Peever the evening before the accident, and that, on that occasion, the train did not stop at Peever long enough for him to get off. But this was immaterial to plaintiff's case: First, because this fact had not been communicated to him until after the accident; and, second, plaintiff testified that he had frequently traveled from Sisseton to Peever on this same train, and that it had always stopped at Peever long enough for him to leave his seat and get off after the train had come to a full stop, so that he had no reason to believe he would not have plenty of time to get off after the train stopped.

In view of all the circumstances connected with the happening of this accident, the explanation given by plaintiff immediately after its happening, and the absence of any positive or direct proof as to how plaintiff was injured, we believe the evidence is insufficient to support the verdict, and that a new trial should be awarded.

The judgment and order appealed from are reversed.

SMITH, J., not sitting.